AO 91 (REV.5/85) Criminal Complaint          AUSA J. Gregory Deis (312) 886-7625

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

**FILED**
6-2-11
JUN X 2 2011
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

MAGISTRATE JUDGE KEYS

UNITED STATES OF AMERICA

v.

VICTOR BROWN

**CRIMINAL COMPLAINT**

CASE NUMBER:

**UNDER SEAL** 11 CR 0387

I, the undersigned complainant, being duly sworn on oath, state that the following is true and correct to the best of my knowledge and belief: From on or about February 22, 2011 to on or about March 1, 2011, at Chicago, Illinois, in the Northern District of Illinois, Eastern Division, VICTOR BROWN defendant herein:

did attempt to commit extortion, which extortion would affect interstate commerce, in that defendant attempted to obtain property, in the form of money from Company A, with the consent of Company A and its owner induced under the color of official right;

in violation of Title 18, United States Code, Section 1951. I further state that I am a Special Agent with the Federal Bureau of Investigation, and that this complaint is based on the facts contained in the Affidavit which is attached hereto and incorporated herein.

_____ SA, FBI
Signature of Complainant
MICHAEL PONICKI
Special Agent, Federal Bureau of Investigation

Sworn to before me and subscribed in my presence,

June 2, 2011             at    Chicago, Illinois
Date                                          City and State

ARLANDER KEYS, U.S. Magistrate Judge _____
Name & Title of Judicial Officer            Signature of Judicial Officer

STATE OF ILLINOIS     )
                       ) SS
COUNTY OF COOK     )

## AFFIDAVIT

### BACKGROUND

I, Michael Ponicki, first duly sworn, depose and state as follows:

1.      I have been employed as a Special Agent with the Federal Bureau of Investigation ("FBI") for approximately eight years and six months, having been assigned to the Chicago Division for five years and six months and the Buffalo Division for three years. Since 2006, I have been assigned to a Tactical Gang Squad and White Collar Crime/Public Corruption Squad in Chicago, and have investigated violations of Title 21 and Title 18, including, but not limited to, 18 U.S.C. §§ 1341, 1343 and 1951.

2.      I am familiar with the facts and information contained in this Affidavit from my participation in the investigation of Victor BROWN, including, but not limited to, my own personal observations, witness interviews, analysis and review of documents, records and other physical evidence, and discussions with other law enforcement officials, including, but not limited to, other FBI special agents and investigators from the Chicago Police Department ("CPD") - Internal Affairs Division ("IAD").

### PURPOSE OF AFFIDAVIT

3.      This Affidavit is being submitted for the purpose of establishing probable cause in support of a criminal complaint charging that, from on or about February 22, 2011 and continuing through at least on or about March 1, 2011, Victor BROWN did attempt to commit extortion, which extortion would affect interstate commerce, in that BROWN attempted to obtain property, in the form of money from Company A, with the consent of Company A and its owner

induced under the color of official right, in violation of 18 U.S.C. § 1951 (the "Subject Offense").

4.    This Affidavit is also submitted for the purpose of establishing probable cause in support of search warrants to: (a) search the cellular telephone identified as the T-Mobile USA cellular telephone with the telephone number 773-899-0195, and International Mobile Subscriber Identity ("IMSI") number 3102604888617503, subscribed to Victor BROWN ("Subject Phone"), as further described below and in Attachment B; and (b) search 4554 South King Drive, Unit 4E, Chicago, Illinois ("Subject Premises"), which is further described below and in Attachment A, to search for and seize the Subject Phone, as further described below and in Attachment B.

5.    Because of the limited purpose of this Affidavit, I have not included every detail known to me concerning Victor BROWN or this investigation. Instead, I have included only those facts that are necessary to support the complaint and search warrants requested herein.

## FACTS SUPPORTING PROBABLE CAUSE

### Background of FBI's Investigation of Victor BROWN

6.    From approximately 1998 through March 16, 2011, Victor BROWN was a Chicago Police Department ("CPD") officer. On approximately March 16, 2011, BROWN resigned from CPD.

7.    Since approximately 2008, FBI has been investigating Victor BROWN. During the investigation, on multiple occasions, BROWN received bribes in exchange for promises to influence disciplinary decisions of the CPD Board.[1] On approximately June 4, 2010, BROWN was charged in a one-count information in *U.S. v. Brown*, 10 CR 378 (Lefkow, J.) with making

---

[1] A detailed recitation of the evidence against BROWN in case 10 CR 378 can be found at R.1 on the public docket.

the following materially false statements to FBI agents, in violation of Title 18, United States Code, Section 1001(a)(2):

    i.  BROWN stated he had never asked for money from a CPD officer in return for influencing people at the CPD Board;

    ii.  BROWN stated he had not ever accepted money from a police officer in return for influencing people associated with the CPD Board;

    iii.  BROWN stated he had not ever suggested to anyone that he could have a separation or disciplinary case fixed at the CPD Board; and

    iv.  BROWN stated he had not told anyone that he has a contact or contacts at the CPD Board.

8.    On approximately March 11, 2011, BROWN pled guilty to the information.

## Attempted Extortion of Individual A and Company A

9.    In approximately early March 2011, the FBI learned that BROWN had attempted to extort Individual A and Company A. Individual A owns Company A, which is in the business of providing individual personal loans.

10.    During February and March 2011, Individual B was an employee/security guard at Company A.

### Information from Individual A

11.    As part of its investigation, the FBI received information from Individual A.[2]

12.    According to Individual A, on or about February 22, 2011, BROWN applied for

---

2 Individual A has juvenile convictions for alcohol-related and driving offenses and has a current pending state charge for driving under the influence of alcohol.

and received a $2,000 loan from Company A. Individual B acted as a reference for BROWN in connection with the loan application.

13.     According to Individual A, between approximately February 23 and February 24, 2011, BROWN called Company A on multiple occasions and spoke to multiple employees. During these calls, BROWN requested an additional loan, beyond the previous loan for $2,000. BROWN asked for approximately $4,000 to $5,000. Individual A instructed Company A employees to tell BROWN that Company A could not loan BROWN additional money.

14.     According to Individual A, on approximately February 25, 2011, Individual B contacted Individual A and said that Individual B had something s/he needed to discuss in person with Individual A.

15.     According to Individual A, later on approximately February 25, 2011, Individual A met Individual B at Company A. During the meeting, Individual B informed Individual A that Individual B had met with BROWN earlier that day. According to Individual B (as told to Individual A), BROWN stated: (a) Individual A was under federal investigation for fraud, drug dealing and illegal collection practices; (b) Individual A was under surveillance and his/her phones were being monitored; (c) law enforcement believed Individual A was using a gun to collect loans; and (d) Company A would likely be raided.

16.     Further, during this meeting, Individual B told Individual A that BROWN had sent multiple text messages to Individual B. Individual B allowed Individual A to review the text messages. According to Individual A, although s/he did not recall the exact content of the text messages, the text messages related generally to a criminal investigation and potential criminal charges against Individual A – consistent with the statements BROWN made to

- 4 -

Individual B (which Individual B shared with Individual A as discussed in paragraph 15).

17.     According to Individual A, Individual A then discussed BROWN's allegations with Individual C, a friend and employee at Company A. Further, Individual A discussed BROWN's allegations with Individual D, a law enforcement officer and private investigator. Following those conversations, Individual A asked Individual B to invite BROWN to meet at Company A. BROWN arrived at Company A later that night.

18.     According to Individual A, the following individuals were present for the meeting with BROWN: Individual A, Individual B, Individual C and Individual D.[3]  According to Individual A, during the meeting, BROWN stated: (a) there was a CPD and federal investigation of Individual A and/or Company A; (b) BROWN learned of the investigation from a CPD commander; (c) the investigation related to allegations of embezzlement and fraud; (d) law enforcement believed Individual A had been involved in a hit-and-run accident; and (e) BROWN had listened to recordings of Individual A.

19.     According to Individual A, the next day, on approximately February 26, 2011, Individual B contacted Individual A and stated that BROWN had contacted Individual B repeatedly asking for an additional loan from Company A. Individual B asked Individual A to turn off Individual B's phone.[4]

---

3 Individual B's recollection of this meeting is set forth in paragraph 34, *infra.* The FBI also interviewed Individual D, a law enforcement officer, and obtained information about, among other things, the February 25, 2011 meeting with BROWN. According to Individual D, BROWN stated: (a) Individual A had been intercepted on a CPD wiretap; and (b) based on evidence from the CPD wiretap, Individual A had been involved in a DUI accident and dealing cocaine. Individual D also stated that BROWN appeared nervous when he saw Individual D because Individual D's badge and gun were visible. According to Individual D, BROWN appeared to believe that Individual D was going to arrest BROWN.

4 According to both Individual A and Individual B, Individual A provided Individual B his/her

20.     According to Individual A, using (847) 471-XXXX, Individual A then contacted BROWN on the Subject Phone.[5]  According to Individual A, during this call, BROWN stated he did not want to talk on the phone and would send a text message.

21.     According to Individual A, within minutes, and continuing for a period of days, Individual A received multiple text messages from BROWN, who was using the Subject Phone. According to phone records for Individual A's phone, (847) 471-XXXX, beginning on February 26, 2011, at 2:58 p.m. and continuing through March 1, 2011, approximately 129 text messages were sent from the Subject Phone to (847) 471-XXXX.  The content of some of these text messages is set forth in paragraph 39, *infra*.

### Information from Individual B

22.     As part of its investigation, the FBI also received information from Individual B.[6]

23.     According to Individual B, Individual B has known BROWN for approximately five years but s/he does not know BROWN well.

24.     According to Individual B, on approximately February 21, 2011, Individual B saw BROWN at a casino.  BROWN asked Individual B to borrow $200.  Individual B agreed. BROWN failed to repay Individual B that night.

25.     According to Individual B, the next day, on approximately February 22, 2011, BROWN, using the Subject Phone, contacted Individual B, using (312) 771-XXXX.  According to Individual B, during this call, BROWN asked Individual B for an additional $500.  Individual

phone because Individual B was an employee of Company A.  Records for the phone confirm that the phone is subscribed in the name of Company A.

5 Phone records for Individual A's phone, (847) 471-XXXX, reflect a call to the Subject Phone on February 26, 2011 at approximately 2:49 p.m.

6 Individual B has a prior drug conviction.

B said s/he could not lend BROWN any additional money and suggested that BROWN apply for a loan from Company A.

26.     According to Individual B, later that day, BROWN applied for and received a $2,000 loan from Company A. Individual B assisted BROWN with the loan application and Individual B acted as a reference for BROWN in seeking Individual A's approval for the loan.

27.     According to Individual B, on approximately February 22, 2011, using the loan proceeds, BROWN repaid Individual B the $200 BROWN had previously borrowed from Individual B on February 21, 2011.

28.     According to Individual B, between approximately February 23 and 24, 2011, BROWN sent Individual B multiple text messages from the Subject Phone. Individual B said s/he also spoke with BROWN on the Subject Phone. Phone records for Individual B's phone, (312) 771-XXXX, reflect approximately 139 text messages and 27 calls between (312) 771-XXXX and the Subject Phone between February 23 and 24, 2011.

29.     According to Individual B, in the text messages[7] and during the calls, BROWN told Individual B that he needed to talk with Individual B about something "serious" that BROWN did not want to discuss over the phone. BROWN told Individual B that Company A was in "trouble."

30.     According to Individual B, Individual B met with BROWN in person on approximately February 25, 2011 in the morning. According to Individual B, during the

---

7 The FBI obtained a search warrant for Individual B's phone, (312) 771-XXXX, on approximately March 24, 2011, but did not locate any text messages received from or sent to the Subject Phone. During a subsequent interview, Individual B told the FBI that s/he deleted the text messages from his/her phone. Phone records for Individual B's phone, (312) 771-XXXX, confirm that there were approximately 228 text messages between (312) 771-XXXX and the Subject Phone between February 21 and March 1, 2011.

meeting, in summary, BROWN stated that: (a) a CPD commander had informed BROWN that Company A was under federal investigation; (b) there were wiretaps and Individual A had been caught purchasing cocaine; (c) Individual A had been involved in a hit-and-run accident and falsely reported that the vehicle had been stolen; and (d) the CPD commander allowed BROWN to listen to wiretap recordings in which Individual A discussed the hit-and-run incident and instructed another Company A employee ("Individual E") to say that the vehicle had been stolen and that Individual E had forgotten to file a police report.

31. According to Individual B, Individual B asked BROWN if s/he could share this information with Individual A and further stated that, if Individual B did share BROWN's information with Individual A, Individual A would likely have questions. BROWN responded that Individual B could share the information with Individual A and BROWN would be willing to meet with Individual A as long as Individual A would not "throw him [BROWN] under the bus." BROWN told Individual B he could lose his job for providing this information.

32. According to Individual B, Individual A and Individual B met in person on approximately February 25, 2011 and Individual B told Individual A what BROWN had said during Individual B's meeting with BROWN earlier on the morning of February 25, 2011 (discussed in ¶¶ 30-31).

33. According to Individual B, Individual B asked BROWN to meet with Individual A and BROWN agreed.

34. According to Individual B, the meeting occurred on or about the evening of February 25, 2011. In addition to Individual A, two other individuals – Individual C, a Company A employee, and Individual D, a law enforcement officer – were also present during the meeting.

- 8 -

According to Individual B, BROWN initially appeared nervous when he saw Individual D and said words to the effect of, "I don't do this s**t," which Individual B understood to mean BROWN was unwilling to talk in the presence of Individual D. According to Individual B, upon seeing Individual D, BROWN immediately asked to use the washroom. When BROWN returned, Individual D tried to put BROWN at ease by mentioning some of the CPD officers Individual D knew. Ultimately, BROWN agreed to talk and made statements generally consistent with the statements made during Individual B's meeting with BROWN on the morning of February 25, 2011 (discussed in ¶¶ 30-31). Individual B further stated that, during this meeting, BROWN referred to a "hazing" incident Individual A had allegedly been involved in during high school and stated that he (BROWN) knew Individual A was a "trust fund baby."

35.     According to Individual B, later on February 25, 2011 and continuing through February 26, 2011, BROWN, using the Subject Phone, sent Individual B multiple text messages. Individual B also spoke with BROWN on the Subject Phone. Phone records for Individual B's phone, (312) 771-XXXX, reflect approximately 48 text messages and 22 calls between (312) 771-XXXX and the Subject Phone between February 25, 2011 and February 26, 2011.

36.     According to Individual B, at some point on approximately February 26, 2011, Individual B contacted BROWN to ask BROWN to stop sending text messages. During this conversation, BROWN mentioned that he had a $1,400 payment due soon on his loan from Company A. BROWN mentioned the possibility of an "extension" of his WFI loan, which Individual B understood to mean extra time to repay the loan. Individual B told BROWN that Individual B could not get in touch with Individual A to ask for an extension of the payment due date, but further told BROWN that Individual A was a reasonable person who would potentially

- 9 -

work something out with BROWN. Individual B encouraged BROWN to discuss working something out with Individual A when BROWN dropped off whatever payment he could make to Company A.

37.     According to Individual B, during this same conversation, BROWN asked Individual B what s/he thought Individual A was going to do in response to the information BROWN provided. BROWN said if Individual A wanted to do something s/he needed to act quickly because it would be easier for BROWN to help Individual A prior to 3:00 p.m. that day when a shift change was scheduled to occur. During the conversation, BROWN said words to the effect of: "I'm not going to do all this talking for free. I'll go to my commander and see if he could work something out but he can't make it disappear. I know my commander, I can go there."

38.     According to Individual B, later that day, Individual A called and was extremely upset. Individual A said BROWN had sent him numerous text messages. Individual A told Individual B to stop communicating with BROWN. Individual B asked Individual A to turn off Individual B's phone so BROWN could not contact Individual B.

<u>Text messages from BROWN to Individual A</u>

39.     With the consent of Individual A, Affiant searched Individual A's phone, (847) 471-XXXX, and reviewed multiple text messages between (847) 471-XXXX and the Subject Phone. In the text messages, BROWN made numerous statements: (a) relating to potential criminal charges against Individual A; and (b) requesting an increased loan amount. These statements include, but are not limited to, the following excerpts from text messages[8]:

---

8 These are only excerpts from the text messages. During the text messages, BROWN made

February 26, 2011

   i.  On February 26, 2011, at approximately 2:58 p.m., BROWN, using the Subject Phone, sent a text message to Individual A on (847) 471-XXXX, which contained the following statements: "I can go to the [CPD] unit an Holla at my people [other CPD officers] about 'u man's' [criminal charges against Individual A]! U get me! It [criminal charges] may come down as early as next week or week after!"

  ii.  Three minutes later, at approximately 3:02 p.m., BROWN, using the Subject Phone, sent a text message to Individual A on (847) 471-XXXX, which contained the following statements: "They haven't signed off on idtmt [indictment] yet! An u on prob [probation] paper from that hs [high school][9] thing. This isn't some tht will jut blow over it is real! But it can be dlt wit [dealt with]!!"

 iii.  At approximately 4:16 p.m., BROWN, using the Subject Phone, sent a text message to Individual A on (847) 471-XXXX, which contained the

---

statements relating to subject matters other than potential criminal charges against Individual A and an increased loan amount. Further, although the total number of text messages was approximately 129, it appears that, in most instances, BROWN's communications to Individual A consisted of multiple text messages because the character content was too large for one text message. For example, BROWN sent 4 text messages to Individual A between 2:58:30 and 2:59:27 on February 26, 2011 and these messages appear to be part of one continuous communication. Finally, in paragraph 39 of this affidavit, I have provided an interpretation of BROWN's statements in brackets, which are based on my knowledge of all the evidence from this investigation as a whole – including, but not limited to, information provided by Individual A – as well as my law enforcement experience.

9 As noted in footnote 2, Individual A has juvenile convictions, a fact BROWN is apparently aware of.

- 11 -

following statements: "Ur in serious hot water an u act as if u dnt really care! . . . It isn't a joke or a game! An u wnt be able to eas outta it!"

iv. At approximately 4:31 p.m., Individual A, using (847) 471-XXXX, sent a text message to BROWN on the Subject Phone, which contained the following statement: "Dude, stop. I'm in no trouble, I didn't do anything wrong. Thanks for the heads up but I'm good. Thank you."

v. At approximately 5:49 p.m., BROWN, using the Subject Phone, sent a text message to Individual A on (847) 471-XXXX, which contained the following statements: "I was gone take a love tkn an make some great things happen for u [provide assistance with pending charges] before it is to late! U could have made it look un noticeable! Just make my loan for 5 [$5,000] an ill sign an take to the people an they let me have the duplex! Feel me! It is easier to influence an decision than it is to change a out come! An between today an tomorrow is easier because the bigs [CPD supervisors] are off weekends! . . . It isn't a joke or game! An if u reach out or try an bother people it will also damage ur cause! The biggest fish in this town far bigger than u have been nailed!"

vi. At approximately 6:04 p.m., BROWN, using the Subject Phone, sent a text message to Individual A on (847) 471-XXXX, which contained the following statements: "I guess u made some enemies some where! An what happens is people start talking when they get fk up an start singing [individuals had provided information to law enforcement]! . . . The shit I

- 12 -

told u wasn't for fun or joke! U dnt joke stuff like that! An I dnt just hear that at a frat house! An u on paper for that hs [high school] shit already u dnt need this! Fast eddie v [Vrdolyak]! Was heavy as whale shit an untouchable! He in jt [the joint, meaning prison]!"

vii. At approximately 6:05 p.m., Individual A, using (847) 471-XXXX, sent a text message to BROWN on the Subject Phone, which contained the following statement: "No thank you. Peace be with you."

viii. At approximately 6:12 p.m., BROWN, using the Subject Phone, sent a text message to Individual A on (847) 471-XXXX, which contained the following statements: "No thank u what dogg! . . . U asked what u should do! I know the people [who make decisions regarding potential charges]! Ill do whatever I can for u because! But I cnt just do to be doing an u dnt acknowledge! All I ask for was u to extend my papers [increase BROWN's loan amount]! I owe that! An that isn't anything ur giving me! Me bring u that that I have already should show u that I'm a straight an cool guy! I'm trying to close on a deal for me an wife! I told u what I dnt have or need to! . . . I dnt ask for a gift! I gave a favor for a friend! An I will an can do more an show a lot more! Get papers an more [provide paper relating to the investigation to Individual A]! . . . So it isn't a gift nor do I ask for anything free! I'm a old school throw back man! I just need a lil more help!"

ix. At approximately 6:37 p.m., BROWN, using the Subject Phone, sent a text

- 13 -

message to Individual A on (847) 471-XXXX, which contained the following statements: "I dnt know what level or stage that ur stuff is at [internal law enforcement review of charges against Individual A] yet because I dnt go digging! As soon as I left my comm. [CPD commander] offices I called [Individual B] an tried to reach an tell him! An the he u! But its there an real an true! But I dnt know the level!"

February 27, 2011

x. On February 27, 2011, at approximately 8:50 a.m., BROWN, using the Subject Phone, sent a text message to Individual A on (847) 471-XXXX, which contained the following statements: "I'm about to go in to work this morning! I'm going to research that [criminal investigation against Individual A] further! If u could do that [increase the loan amount] for me ill appreciate it!"

February 28, 2011

xi. At approximately 8:53 a.m., BROWN, using the Subject Phone, sent a text message to Individual A on (847) 471-XXXX, which contained the following statements: "Goodmorning [Individual A]! I have some paperwork [relating to the criminal investigation] I'm getting later on today that will be beneficial to u bro! Ill bring down or give [Individual B]! Oh! Do u think u could extend me that additional 2500 [dollars] until the end of the week my taxes will be back an I can pay us back the whole amount [the original $2,000 along with the additional $2,500 requested]

- 14 -

Friday at 4PM!"

xii. At approximately 11:48 a.m., Individual A, using (847) 471-XXXX, sent a text message to BROWN on the Subject Phone, which contained the following statement: "Do you have paperwork?"

xiii. At approximately 11:56 a.m., BROWN, using the Subject Phone, sent a text message to Individual A on (847) 471-XXXX, which contained the following statements: "I can't get in there a get access to that [information relating to investigation against Individual A] until later this evening! Hey I've given u [some information] already! . . . I need that [additional loan] for personal reasons an ill sign to pay u back! Not for free or bribe or anything! . . . It isn't my teams [it isn't BROWN's squad running the investigation]! Its anothers but I know who [the CPD officer(s)] is running it! Big wigs [supervisors] leave around 7ish. What imam do is a friend! What I'm asking u is business! Ill still sign to pay back with whatever u say the extra has to be! I just need some more help!"

xiv. At approximately 11:56 a.m., Individual A, using (847) 471-XXXX, sent a text message to BROWN on the Subject Phone, which contained the following statement: "I need proof and we can talk."

xv. At approximately 12:05 p.m., BROWN, using the Subject Phone, sent a text message to Individual A on (847) 471-XXXX, which contained the following statements: "I'm not going to go in a get documents [relating to the investigation] an make copies an u dnt want help me! I dnt

- 15 -

understand!  U want me to do everything for u up front [before Individual A provides BROWN with the additional loan]!  This is my livelihood!  I'm signing for a loan that I have to pay back!  It isn't a gift!  I told u free info! . . .  Ur probation from that hazing thing aint nothin!  I'm not trying to scare u or nothing!  Its u an ur life!"

xvi.  At approximately 12:09 p.m., BROWN, using the Subject Phone, sent a text message to Individual A on (847) 471-XXXX, which contained the following statements:  "They were two separate things!  One was business!  The other was for a friend!"

xvii.  At approximately 12:41 p.m., BROWN, using the Subject Phone, sent a text message to Individual A on (847) 471-XXXX, which contained the following statements:  "Its crazy because u speak as if u have control over this situation [the investigation]!  U have control over when whom an how u choos to lend ur money!  But not this!  I mean u ask me to walk the tight rope, jump, over cars, an risk my career for u [provide assistance with the investigation] to extend me a personal high interest loan!  Wow!  When I've given u the heads up [notice regarding the investigation]!  Told u I know who working on it!  An even said it [charges] may be coming down soon! . . .  Not many people get heads up an guided!  An I dnt ask u for anything illegal or wrong! . . .  An really all I'm asking is for a bigger loan with bigger interest!"

xviii.  At approximately 10:36 p.m., BROWN, using the Subject Phone, sent a

- 16 -

text message to Individual A on (847) 471-XXXX, which contained the following statements: "Ur indimt [indictment] is coming down next week! I was gone try an stop that [the indictment] but u blow me an it off!"

March 1, 2011

    xix.  At approximately 11:06 a.m., BROWN, using the Subject Phone, sent a text message to Individual A on (847) 471-XXXX, which contained the following statements: "After tomorrow at 1PM there will be nothing that I could do period! Ur currently set to go threw the chain of command [for review of the charges] for sign off! U dnt have to say shit! An u dnt have to every respond! There [law enforcement] going to freeze all ur funds accounts trust funds! Charge u with 20 counts! Ull have to retain a lawyer with ur property as collateral! An u will plea out! Ur back ground is already probation for the hazing thing! An u will prolly get 8-10 with plea!"

Information from law enforcement databases

40.    According to the databases of the FBI, CPD and the Drug Enforcement Administration, there are no active criminal investigations involving Individual A.[10]

---

10 Further, according to Individual A, s/he has never distributed narcotics. Further, Individual A stated that s/he: (a) was not involved in a hit-and-run accident; (b) did not lie or file a false report with any law enforcement agency or insurance company relating to an accident; and (c) did not ask or instruct anyone else to lie or file a false report with any law enforcement agency or insurance company relating to an accident.

Interstate commerce

41.     Based on information from law enforcement officers with expertise in telecommunications matters, the text messages between the Subject Phone (a T-Mobile phone) and Individual A's phone (a Sprint Nextel phone) involved interstate communications because all Sprint Nextel text messages originating or terminating in the Chicago, Illinois area travel through a Sprint Nextel switching center in Independence, Missouri.

42.     Further, according to Individual A:

    i.  Company A maintains a website on the internet and has an on-line loan application available on its website.

    ii.  Company A regularly purchases goods and services from companies with headquarters and principal places of business outside Illinois, including, but not limited to, banking services, payroll services, insurance, computers, cellular devices and office supplies.

    iii.  Company A regularly uses the internet for multiple purposes in conducting its business, including, but not limited to:  (a) on-line banking services; (b) on-line background checks for loan applicants; and (c) on-line payroll services.

    iv.  Company A maintains bank accounts at Bank A, which is headquartered outside Illinois, and uses Bank A's on-line banking site to manage its accounts.

- 18 -

## THE SUBJECT PHONE

43.    As noted above, according to Individual A and phone records for Individual A's phone, (847) 471-XXXX, there were multiple text messages between (847) 471-XXXX and the Subject Phone between approximately February 26, 2011 and February 28, 2011, including, but not limited to, the text messages discussed in paragraph 39. Because the Subject Phone was used to send these text messages, which constitute evidence of the Subject Offense, BROWN's possession of the Subject Phone is evidence of BROWN's commission of the Subject Offense. Further, through a search of the Subject Phone, the FBI may be able to recover evidence concerning these text messages, which would constitute further evidence of the Subject Offense.

44.    Moreover, according to Individual B and phone records for Individual B's phone, (312) 771-XXXX, there were multiple text messages and calls between (312) 771-XXXX and the Subject Phone between approximately February 21, 2011 and March 1, 2011. According to Individual A and Individual B, some of these text messages contained statements by BROWN relating to potential criminal charges against Individual A. Through a search of the Subject Phone, the FBI may recover evidence concerning these text messages, which would constitute further evidence of the Subject Offense.

45.    Based on the above, there is probable cause to believe that BROWN's possession of the Subject Phone would constitute evidence of BROWN's commission of the Subject Offense and, more generally, evidence relating to the Subject Offense will be recovered from the Subject Phone.

### SUBJECT PREMISES

46.     The Subject Premises is described as the apartment designated "4E" at 4554 S. King Drive, Chicago, Illinois, which is a red brick, four-story, four-unit building, with a white door in the front of the building providing a common entryway to 4554 S. King Drive and 4556 S. King Drive, which is an attached four-unit building. The Subject Premises is located on the southeast corner of King Drive and 45th Place. Unit 4E is on the fourth floor and the door to the unit is at the top of the stairs, to the left. The Subject Premises has a black fence around the perimeter and, at the entryway to the building, there are four buzzers for the four units located at 4554 S. King Drive, Chicago, Illinois and four buzzers for the four units located at 4556 S. King Drive, Chicago, Illinois.

47.     BROWN is believed to reside at the Subject Premises. The evidence that BROWN lives at the Subject Premises includes, but is not limited to, the following:

  i.   BROWN's Illinois driver's license reflects 4554 S. King Dr. Chicago, IL as his address.

 ii.   In connection with BROWN's loan application to Company A on February 22, 2011, BROWN listed 4554 S. King Dr. Chicago, IL as his address and submitted documents from Farmer's Insurance and BlueCross BlueShield of Illinois listing that same address, with the BlueCross BlueShield of Illinois document identifying "Unit 4E" as BROWN's unit.

iii.   On May 10, 2010, in 10 CR 378, before the Hon. Michael T. Mason, BROWN signed an Order Setting Conditions of Release and listed 4554 S. King Dr. #4E, Chicago, IL as his address.

    iv. On or about February 18, 2011, FBI agents interviewed BROWN at the

     Subject Premises.

  48.  As set forth in detail above, BROWN used the Subject Phone during February and

March 2011 and, according to phone records for the Subject Phone, the phone is subscribed to

BROWN at the address for the Subject Premises.

  49.  Based on the above, I submit there is probable cause that the Subject Premises

will contain the Subject Phone.

<b>CELL PHONE SEARCH PROTOCOL</b>

  50.  With respect to the search of the Subject Phone and any related memory cards or

removable storage media, law enforcement personnel will locate the information to be seized

according to the following protocol:

  51.  The search procedure may include the following techniques (the following is a

non-exclusive list, and the government may use other procedures that, like those listed below,

minimize the review of information not within the list of items to be seized as set forth herein):

    i. searching for and attempting to recover any hidden, or encrypted data to

     determine whether that data falls within the list of items to be seized as set

     forth herein;

    ii. surveying various file directories, electronic mail, text messages, contact

     lists, address books, call logs, calendars, notes, appointments, task lists,

     voice mail, audio files, video files, or pictures, including attachments

     thereto, to determine whether they include data falling within the list of

     items to be seized as set forth herein;

- 21 -

    iii.  opening or reading portions of electronic mail or text messages, and attachments thereto, in order to determine whether their contents fall within the items to be seized as set forth herein; and/or

    iv.  performing key word searches through all electronic mail or text messages, and attachments thereto, to determine whether occurrences of language contained in such electronic mail or text messages, and attachments thereto, exist that are likely to appear in the information to be seized described in Attachment.

52. Law enforcement personnel are not authorized to conduct additional searches on any information beyond the scope of the items to be seized by this warrant.

## ITEMS TO BE SEIZED

53.    FBI's search and seizure of the Subject Premises will be limited to the following:

    i.  The Subject Phone.

54.    FBI's search and seizure of the Subject Phone will be limited to the following:

    i.  All text messages received on or sent from the Subject Phone relating to the Subject Offense;

    ii.  All names, aliases, and numbers stored in the Subject Phone associated with text messages identified in (i); and

    iii.  All digital photographs located in the memory of the Subject Phone that appear to contain images of BROWN.

**CONCLUSION**

55.     Based on the above, Affiant submits there is probable cause to believe that:  (a) BROWN committed the Subject Offense, in that BROWN did attempt to commit extortion, which extortion would affect interstate commerce, in that BROWN attempted to obtain property, in the form of money from Company A, with the consent of Company A and its owner induced under the color of official right, in violation of Title 18, United States Code, Sections 1951; (b) the Subject Phone contains evidence of the Subject Offense, as further described in Attachment B; and (c) the Subject Premises contains evidence concerning the Subject Offense, specifically, the Subject Phone.


FURTHER Affiant sayeth not.


_____
Michael Ponicki, Special Agent
Federal Bureau of Investigation


Signed and subscribed to before
me on this 2nd day of June, 2011

_____
Arlander Keys
UNITED STATES MAGISTRATE JUDGE


- 23 -